

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JULIETTE FAIRLEY,

        Plaintiff,

-against-

BROOKDALE SENIOR LIVING INC, BROOKDALE SENIOR LIVING COMMUNITIES INC, HORIZON BAY REALTY L.L.C., HCP INC
        Defendant.

Index No.: 12 CV 8141

COMPLAINT

Jury Trial Yes ✔ No ___

JULIETTE FAIRLEY, being duly sworn, deposes and says the following under the penalties of perjury:

    1. I am the Plaintiff in the above-referenced matter and am fully familiar with the facts and circumstances stated herein.

    2. Brookdale Senior Living Communities Inc is an active foreign business corporation headquartered in Nashville, Tennessee. According to a company issued press release, Horizon Bay Realty, made up of 91 senior living communities in 19 states, including Texas, was acquired by Brookdale Senior Living Inc in 2011, at which time Brookdale Senior Living began providing management services to the Horizon Bay communities. Horizon Bay leased 33 communities from HCP Inc, headquartered in Long Beach, California. Brookdale entered a joint venture with HCP Inc. in relation to 33 communities that Tampa-based Horizon Bay leases from that company. The joint venture owns and operates 21 of those communities and lease the remaining 12 from HCP with Brookdale managing all 33 properties. SEC filings indicate that Brookdale Senior Living Inc is the parent of Brookdale Senior Living Communities. On their website, it is noted that Brookdale Senior Living is the nation's largest owner and operator of senior living communities throughout the United States

and currently operates more than 648 senior living, assisted living and retirement communities in 38 states. It is therefore respectfully submitted that the federal court has jurisdiction over the defendants since they do business across the United States as a foreign corporation licensed in the states of New York, Texas and Tennessee.

3. This matter essentially involves claims not only for negligent and intentional infliction of emotional distress but also financial loss incurred by plaintiff while her father, James Edgar Fairley, was a resident at the Horizon Bay San Antonio/Brookdale Senior Living memory care facility in San Antonio, Texas from May 19, 2010 to November 22, 2011 under the executive direction of Scott Smith.

4. Plaintiff invested considerable amount time, money and effort attempting to comfort, protect, defend and stop harassment of her 83-year old father as well as prevent his untimely death at the facility. Under the executive direction of Scott Smith, it was the facility staff's job to protect, defend and care for plaintiff's father but instead plaintiff presents documentation that she believes proves the facility's staff along with Scott Smith conspired against plaintiff and plaintiff's father to harass, neglect, discriminate against and abuse both father and daughter during plaintiff's visits to her father and while plaintiff was away from the facility and her father.

5. This action arises under 28 U.S.C. § 1332 and 28 U.S.C. § 1331, which state that the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States and that the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States of America. The plaintiff's claim of emotional distress arose in New York based on negligent, abusive and discriminatory

acts that plaintiff and her father endured from the staff while plaintiff's father resided in the Horizon Bay/Brookdale Senior Living San Antonio facility. As a result of the emotional distress, plaintiff was unable to earn and was forced to pursue therapy. In addition, plaintiff incurred considerable financial loss attempting to assist her father. The Southern District of New York is the proper venue for this lawsuit because the cause of action arose while the plaintiff lived in New York and traveled to Texas to visit her father at a Horizon Bay/Brookdale Senior Living facility that is headquartered in Tennessee.

## STATEMENT OF FACT

1. Plaintiff is a journalist who has written for Steve Forbes, the Wall Street Journal, Reuters, USA Today, the New York Times and many other publications.

2. Plaintiff's father is an 83-year-old veteran who served 20 years in the United States Air Force and was honorably discharged

3. Plaintiff witnessed her father washing blood out of his underwear, which was subsequently reported to the San Antonio Police Department as sexual assault by plaintiff and her mother. Plaintiff's emotional distress resulted from observation of evidence of serious injury to her father while he was a resident at the Horizon Bay San Antonio/Brookdale facility. Plaintiff continues to pursue therapy to cope with the atrocious and utterly intolerable revelation of sexual abuse in what was supposed to be a civilized community. This is an example where plaintiff was the direct recipient of the staff's extreme and outrageous conduct while visiting her father at the facility.

4. Plaintiff's father was tested for HIV as a result, which caused plaintiff outrageous and extreme emotional distress.

5. When visiting her father at the memory care facility, plaintiff witnessed and captured photos of an elderly man, naked except for diapers, sitting in wheel chairs in the living room area of the residence, which assaulted the plaintiff's dignity as well as the plaintiff's father's dignity who was always fully dressed when he was a resident there.

6. Plaintiff witnessed her father interact with a male volunteer who was not registered with the facility as an employee or outside provider. The male volunteer was a friend of one of the staff members and was allowed access to her father without management supervision. Plaintiff complained to the facility management via email about the unregistered, unauthorized access to her elderly father. This is an example where plaintiff was the direct witness of neglect while visiting her father at the facility, which resulted in emotional distress.

7. Plaintiff's mother's financial power of attorney did not extend to medical power of attorney over James Fairley as indicated in a letter signed by the office of Chief of Health Information at the Department of the Air Force, which states, "…this only applies to fiduciary capacity (financial matters)."

8. On various occasions, plaintiff would call the facility and the staff would hang up the phone so that she could not speak to her father. Her father eventually informed plaintiff that facility staff claimed to be taking out a restraining order against her so that she would never see her father again. This threat was outrageous in character and so extreme in degree and goes beyond all possible bounds of decency between a daughter and her elderly father as he nears the end of his life. Plaintiff's mother's statement supports plaintiff's claim. This is an

example where plaintiff was the direct recipient of outrageous conduct by staff at the facility who had no respect for the relationship between an aging father and his only daughter as he neared the end of his life.

9. After providing her father with a cell phone, plaintiff received phone calls from her father residing in Texas in the middle of the night where he pleaded for her help. As a result, plaintiff suffered undue emotional distress in New York with sleepless nights, and her personal, professional and financial life was permanently disrupted when she bought plane tickets, rented cars and paid for hotel rooms in order to travel to Texas to check on her father.

10. On the morning of March 10, 2011 the facility physician Dr. Hai Pham informed plaintiff that her father had not received his blood pressure medication the night before and was being rushed to the emergency room with a blood pressure reading of 100/10. At the hospital that day, plaintiff was informed by telephone that her father was dropped off at the emergency room with incomplete paperwork and without an escort. When the doctors at the hospital tried to contact plaintiff's mother to find out why plaintiff's father was at the emergency room, the doctors were unable to because plaintiff's mother's phone number had been written down incorrectly on plaintiff's father' paperwork by the defendant staff. Plaintiff contacted the hospital at which time she was informed by emergency room physician Dr. Calais that her father had been dropped off with incomplete paperwork

11. Defendant Scott Smith called plaintiff later that night claiming that her father would not be allowed to return to his residence until there was a prescription for

blood pressure medication on file. When plaintiff contacted the doctor at the Veterans Administration hospital the following morning, she was told that her father had been prescribed blood pressure medication for more than 20 years and that the facility already had a renewable prescription on file. Plaintiff retains copies of her father's medical records indicating that he was scheduled to receive Metroprolol, a medication for high blood pressure, twice a day. Plaintiff believes the defendants were negligently and intentionally attempting to threaten and intimidate plaintiff by neglecting her father's health, which was atrocious and intolerable to the plaintiff who resided in New York and could not come to the aid of her father in Texas quickly enough. Plaintiff was forced to hire an outside nursing agency to monitor facility staff when they administered her father's blood pressure medication.

12. Facility physician Dr. Pham subsequently executed additional written orders noting that plaintiff's father was to receive his medications on time, as scheduled. Plaintiff retains all documentation of these incidences.

13. Defendant Scott Smith verbally raged at plaintiff when she called requesting his help to speak with her father on the telephone because staff members at the residence would hang up the telephone when plaintiff called to speak to her father. This is an example where plaintiff was the direct recipient of outrageous conduct by Scott Smith at the facility.

14. On another occasion, when plaintiff was visiting her father, Smith verbally assaulted plaintiff with rage because she had reported the facility to the Department of Aging. As a result of plaintiff's report to the Department of

Aging, the facility had been cited for violations that were released in a subsequent inspection report. This is an example where plaintiff was the direct recipient of outrageous conduct by Scott Smith at the facility.

15. Plaintiff established a report with Adult Protective Services who then referred her to the Probate Court, which appointed guardian ad litem attorney Shawn Hughes to investigate the care and the blood pressure equipment at the defendant's facility. The Guardian ad litem's report confirmed that the defendant's facilities were improperly taking her father's blood pressure with faulty blood pressure equipment.

16. Plaintiff received e-mails from Scott Smith indicating that facility staff members were confusing her father's medication with another African American gentleman in the facility. As a result, plaintiff complained to the National Association for the Advancement of Colored People who attended a meeting at the facility with plaintiff to discuss the neglect of plaintiff's father's care, which Scott Smith and several staff members attended. A letter from the San Antonio NAACP dated July 11, 2011, documents that meeting.

17. On July 18, 2011, a family friend named Randy Lee visited plaintiff's father and reported in a notarized statement that he found plaintiff's father lying in pain on his bed with his stomach distended from having air pumped into his stomach. The father's primary care physician reported to plaintiff in a letter that he had not authorized any testing. Plaintiff's father informed her that the person who performed the stomach testing was a Joe Currasco who, upon information and

belief, is not a medical doctor but rather was a staff member reporting to Scott Smith.

18. Knowing that her father was undergoing unauthorized, tortuous testing caused plaintiff outrageous worry, fear and sleepless nights. Plaintiff's father called frequently from the cell phone she provided him in the middle of the night, asking for help. This caused plaintiff emotional distress because she was unable to arrive to his aid quickly enough. When plaintiff would call the residency's house phone, the defendant staff would hang up in midsentence after plaintiff identified herself.

19. Having knowledge that her father was undergoing abuse that caused him to bleed from his rectum as well as unauthorized, painful stomach testing caused and continues to cause plaintiff emotional distress.

20. After plaintiff's father had developed a persistent cough while a resident at Horizon Bay/Brookdale Senior Living and was tested for HIV, plaintiff experienced outrageous and extreme emotional distress.

21. During his stay at Horizon Bay/Brookdale, plaintiff made frequent visits to her father, arranged for others to look after him, and communicated with the staff in order to ascertain the well-being of her father. But the defendants treated her in such a way as to cause plaintiff to suffer emotional distress. In fact, Scott Smith attacked plaintiff's character, intelligence and education, labeling plaintiff's concern for her father as incestuous.

22. Although Scott Smith had two HIPAA release forms signed by plaintiff's mother and father allowing plaintiff to inquire and receive information about her father's

medical care, he refused to honor them. This also increased plaintiff's emotional distress. This is an example where plaintiff was the direct recipient of blatant disregard and extreme outrageous conduct by the facility while visiting her father at the facility.

23. Additionally, in the middle of the Texas summer, the staff allowed plaintiff's father to go outside in the middle of the day in extreme heat temperatures. This cruelty inflicted upon plaintiff's father directly impacted plaintiff's emotional state causing distress, worry and anxiety when plaintiff's father called plaintiff in New York to report to her the cruelty he experienced.

24. Plaintiff observed her father's roommate exhibiting sexual behavior when she was in his room which was confirmed by her father. When reported to the facility caregivers on duty by the plaintiff, they laughed. Here is an example where plaintiff was the direct recipient of humiliation and disregard while visiting her father at the facility.

25. In October 2011, a friend named Melissa Holt began to visit plaintiff's father in the evenings to play cards and check on him. Caregivers at the facility prohibited her from visiting, saying she needed a drug, alcohol, TB test and a background check in order to visit plaintiff's father. This unwarranted barrier isolated plaintiff's father from his friends and visitors and constituted elder abuse. Plaintiff paid for Miss Holt's undue testing and Miss Holt reported overmedication, which plaintiff also witnessed when speaking on the phone with her father. This caused plaintiff emotional distress as she was unable to get to her father quickly enough to ascertain his over medication.

26. Records from plaintiff's father's ophthalmologist indicated that he was declared legally blind due to severe vision loss from glaucoma while a resident at Horizon Bay/Brookdale Senior Living. It was subsequently disclosed in inspection reports provided by the Department of Aging and obtained by the plaintiff that the defendants had been cited for failing to ensure that eye drop medication was properly administered. Given that plaintiff's father was supposed to receive eye drops for his glaucoma, plaintiff determined from the citation issued by the Department of Aging that the defendants failed to appropriately administer her father's eye medication.

27. Due to the actions of the defendants, plaintiff has letters from therapists about the fact that she pursued counseling to deal with the effects of the verbal abuse that she experienced at the hands of Scott Smith and the neglect of her father at the facility.

28. After plaintiff's father was relocated to another facility, a medical bill dated October 31, 2011 disclosed that two of the defendant's facility doctors Dr. Pham and Dr. Cavazos who had sent letters informing plaintiff that they had stopped treating plaintiff's father in June and August 2011, respectively, had continued to prescribe medication for him from June to November 2011, which resulted in overmedication. Thus, the defendant facility's records were out of date and negligently maintained. This was extremely negligent in that plaintiff's father had a new primary care physician at the Audie Murphy Veteran's Hospital that was not aware that other doctors were still prescribing medications.

In conclusion, plaintiff believes that the above noted facts constitute severe, intentional and or negligent infliction of emotional distress by the defendant. Scott Smith knew or should have known that his actions and his staff's actions would cause family members of the resident James Edgar Fairley emotional distress. **WHEREFORE**, it is respectfully requested that this court order the defendant to compensate plaintiff by paying her $15 million dollars and further relief as this court may deem necessary. Monetary compensation includes:

    a. The cost of hotel rooms, rental cars and air plane tickets on the numerous occasions plaintiff visited her father from May 2010 to November 2011.

    b. The cost of providing plaintiff's father a cell phone

    c. The cost of hiring an outside nursing company to monitor plaintiff's father's medication to ensure her father was receiving his blood pressure medication

    d. Time lost at work from May 2010 to November 2011, which can never be recovered.

    e. The cost of having Miss Holt unnecessarily tested for tuberculosis, drugs and alcohol

    f. The cost of the time and effort plaintiff was forced to invest in meetings with staff while visiting her father to inquire of his care.

    g. The cost of time and effort to write letters of complaint to authorities

    h. The cost of time and effort to meet with various agencies, including the NAACP, the Texas District Attorney and Lawyers for Older

Texans in search of relief for plaintiff's father and to prevent his untimely death.

i.  The disturbance emotionally of being verbally abused by executive director Scott Smith when plaintiff visited her father and when she called Scott Smith on the telephone.

j.  The disturbance of emotional serenity from the knowledge that her elderly father was isolated, neglected, discriminated against, physically abused with medical tests and sexually assaulted so badly that it caused her father to bleed from his rectum. This observation and knowledge will plague the plaintiff for the remainder of her life and causes continued emotional distress. As a result, plaintiff will require counselor for the rest of her life.

k.  The disturbance emotionally that plaintiff's father may have been exposed to HIV as a result of sexual assault at the Horizon Bay/Brookdale Senior Living facility while Scott Smith was executive director there.

JULIETTE FAIRLEY
1 Union Square South
New York, NY 10003
646-709-7828

10-29-2012
Date

12